**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**
-----------------------------------------------------------x

IVY & WILLIAM GOODWIN,

                 Plaintiffs,

             -against-

ROSEANN PALIOTTA, PAUL PALIOTTA, RAC
REALTY ADVISORS, FORECLOSURE
SOLUTIONS, RPGROUP INC., SHARON
ROLLACK-PAYNE, HOCHBAUM WEISS,
BARRY C. WEISS, ARGENT MORTGAGE CO.
LLC,

                Defendants.

-----------------------------------------------------------x

Index No. 07CV11048
(LAP)(GWG)

**COMPLAINT**

## INTRODUCTION

1.     This is an action brought for mortgage and foreclosure fraud under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 et seq., the Truth in Lending Act (TILA), 15 U.S.C § 1640, NY Real Property Law § 320, NY Real Property Law Article 15, NY State General Business Law § 349, and the common law claims of Fraud, Conspiracy to Commit Fraud, Aiding and Abetting Fraud, Negligence, Malpractice.  PLAINTIFFS allege that DEFENDANTS defrauded them into transferring their home to a straw buyer, stripping them of their equity, and purportedly selling their home.  PLAINTIFFS seek equitable relief, compensatory damages, punitive damages, costs, and fees.  PLAINTIFFS' equitable relief would restore them as the rightful owners of their home.

**JURISDICTION**

2.      The court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 as the action arises under the laws of the United States.  The court has jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 as the state claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

**PARTIES**

3.      PLAINTIFFS are owners of a house located 4723 Bronx Boulevard, Bronx, NY 10469.  PLAINTIFFS are currently 60 years of age or older.  PLAINTIFF Ivy Goodwin was employed for more than 20 years at St. Luke's-Roosevelt Hospital as a secretary earning roughly $33,000 per year.  In or about 2002, Ms. Goodwin was laid off from her position and has not been able to find a position elsewhere.  PLAINTIFF William Goodwin is presently employed as a food service operator for Memorial Sloan Kettering Hospital earning roughly $40,000 per year.

4.      DEFENDANT RAC REALTY ADVISORS is a self proclaimed "real estate money management firm" owned and operated by ROSEANN and PAUL PALIOTTA, who live on Long Island, New York.  DEFENDANT RAC REALTY ADVISORS is not registered with the NYS Department of State.  Its address is unknown.

5.      DEFENDANT FORECLOSURE SOLUTIONS is a subsidiary of RAC REALTY ADVISORS, and is owned and operated by ROSEANN and PAUL PALIOTTA.  There are at least four entities under the same or similar name registered with the NYS Department of State, none of them with the same address as DEFENDANT

FORECLOSURE SOLUTIONS, which purportedly does business at 40 Pacific Street, North Babylon, NY 11703.

6.    DEFENDANT RPGROUP INC. is owned and operated also by ROSEANN PALIOTTA.  It is not registered with the NYS Department of State.  Its address is unknown.

7.    DEFENDANT SHARON ROLLACK-PAYNE is the straw buyer of PLAINTIFFS' home.  She resides at 170 Connecticut Avenue, Freeport, NY 11520.

8.    HOCHBAUM WEISS is the law firm that assisted the DEFENDANTS in the fraud as alleged herein.  BARRY C. WEISS is a partner at the firm.  The firm's address is 30 Jericho Executive Plaza, Suite 100E, Jericho, NY 11753.

9.    ARGENT MORTGAGE CO. LLC is one of the largest subprime lenders in the country.  It is responsible for providing financing support in the fraud as alleged herein.  It is located at 333 Westchester Avenue, 1st Floor, White Plains, NY 10604.  JANE DOE is the attorney for ARGENT that appeared on its behalf during the transactions alleged herein.

## BACKGROUND

10.    In early 1999, after roughly seven years of renting an apartment in the Bronx, New York, PLAINTIFFS embarked on the first step to the American dream of home ownership.

11.    On February 25, 1999, with the help of a community service agency called Community Resource Mortgage ("CRM"), PLAINTIFFS found and purchased a home located at 4723 Bronx Boulevard, Bronx, NY 10469 (Block 5102, Lot 17).

12.     PLAINTIFFS mortgaged the home for $185,905 from American Brokers Conduit, with monthly payments at or around $1375.

13.     In or about 2002, after PLAINTIFF Ivy Goodwin was unfortunately laid off from work, the PLAINTIFFS started falling behind on their mortgage payments.

14.     On March 23, 2004, PLAINTIFFS obtained assistance from the Department of Housing and Urban Development and mortgaged their home for a second time for around $11,954, a mortgage serviced by Chase Manhattan Mortgage Corporation.

15.     On October 28, 2004, after PLAINTIFFS continued to have difficulty meeting their daily expenses, including payment of their mortgages, American Brokers Conduit filed suit against PLAINTIFFS for nonpayment of the mortgage.

16.     In late 2004, PLAINTIFFS sought again the help of CRM.  There, a person by the name of ROBERT F. referred PLAINTIFFS to an entity called RAC REALTY ADVISORS, a self proclaimed "real estate money management firm" owned and operated by ROSEANN and PAUL PALIOTTA.  For the referral, ROBERT F. received an undisclosed amount of money.

17.     In or about October 2004, ROSEANN PALIOTTA arranged to meet with PLAINTIFFS at CRM.

18.     There, ROSEANN informed the PLAINTIFFS that her organization had a group of "private investors" who could help the PLAINTIFFS resolve their mortgage problems.  ROSEANN informed the PLAINTIFFS that the "private investors" functioned as "guardian angels" and helped "so many clients stay in their home."  She informed PLAINTIFFS that "it's all perfectly legal."

19.    ROSEANN proceeded to convince the PLAINTIFFS to enter into a "Program," maintained by a RAC REALTY ADVISORS subsidiary called FORECLOSURE SOLUTIONS, also owned and operated by ROSEANN and PAUL PALIOTTA. The Program required PLAINTIFFS to transfer, not sell, ownership of their home to a third party (a "straw buyer"), who would not live in the home, but would merely function as a person with sufficient credit who could obtain a new mortgage that would enable the PLAINTIFFS' mortgage to be paid off. ROSEANN, as agent of the third party, would then hold the remaining monies obtained from the new mortgage above and beyond the old mortgage for a period of 12 to 18 months. These monies, less any fees owed to ROSEANN, RAC REALTY ADVISORS, and FORECLOSURE SOLUTIONS and others, would be used to help PLAINTIFFS pay the new mortgage. In the meantime, ROSEANN would assist the PLAINTIFFS improve their credit scores, pay off any other debt, and obtain a new job, such as with "McDonalds." Upon expiration of the 12 to 18 months, the home would then be transferred back to the PLAINTIFFS through a new mortgage that they would obtain in their own name and that they would be able to afford. Throughout the life of the "Program," plaintiffs would remain in their home and continue to live normally, paying living expenses and enjoying the use of their home.

20.    ROSEANN provided PLAINTIFF with a handout that purportedly described the "Program." According to the handout (all parentheticals in original):

> Utilizing a "trustee" borrower (a new individual with excellent credit rating) we payoff the foreclosing lender by creating a "friendly purchase" (since refinancing would not be allowable by the lending community, otherwise known as a "bailout"). We are now able to finance enough to create a "mortgage subsidy account" (additional funds set aside

in an escrow account) which may only be used to subsidize mortgage payments for a period of up to 2 years.

First all the funds above and beyond closing costs and credit enhancement/administration fees, will be maintained in a designated account which cannot be accessed for any purpose other than loan payment servicing. In the event the individual falls behind sufficiently and has no way of bringing current the new loan deficiency, the "trustee" has authority to liquidate the property in order to pay off the lending intuition and any/all remaining escrowed funds, as well as profit upon sale, will be remitted to that individual.

21.     After this initial meeting, ROSEANN repeatedly telephoned the PLAINTIFFS. She informed them again that the Program was "perfectly legal." She informed them that the PLAINTIFFS would "stay in [their] home;" that they "were in charge;" and that they "would call the shots."

22.     In or about November 2004, encouraged by ROSEANN's repeated representations, the PLAINTIFFS agreed to allow ROSEANN to enter them into the Program.

23.     In or about December 3, 2004, ROSEANN directed the PLAINTIFFS to a meeting where several unknown persons were present.

24.     Leading the meeting was PAUL PALIOTTA, ROSEANN'S husband and business partner. Also present was a lawyer by the name of BARRY C. WEISS, who introduced himself to the PLAINTIFFS as their lawyer. There was also a person by the name of SHARON ROLLACK PAYNE, who plaintiffs learned at the meeting would be the purchaser, that is, the straw buyer. Finally, there was present another attorney, JANE DOE, representing ARGENT MORTGAGE CO LLC.

25.     The PLAINTIFFS were first directed into a private room by "their lawyer." He proceeded to instruct the PLAINTIFFS not to make eye contact with anyone

in the room.  He also instructed them not to speak to each other or with anyone else.  He also instructed them not to ask any questions.  Finally, he instructed them that their only responsibility was to sign any paper he put in front of them.  Specifically, he instructed them not to touch any of the checks.

26.     After being brought back into the conference room, PLAINTIFFS were ushered to their seats.  In short time, PLAINTIFFS were handed several documents to sign.  Meanwhile, other documents and checks were crossing the table.  At one moment, PLAINTIFFS saw a check cross the table for a significant dollar amount.  PLAINTIFF IVY GOODWIN spoke up and asked, "after 12 to 18 months, we're getting our house back, right?"  Their purported lawyer shot a look at her to be silent.

27.     At this time, JANE DOE also shot a look at them.

28.     She, however, just frowned and went back to processing the paperwork.

29.     JANE DOE did not stop the proceedings although she knew that she could not process the paperwork if she had information that the transaction was not a true sale and purchase agreement.

30.     A few minutes later, PLAINTIFFS were ushered out the door, without any documents, and without any information.

31.     "Scams and real estate have been partners for a long time."  John Gibeaut, Mortgage Fraud Mess, ABA Journal at 51 (July 2007).  But recently, the scams have targeted "individual borrowers, especially longtime homeowners who find themselves in financial distress.  These schemes are carried out by rings that may encompass lenders, brokers, appraisers, and other real estate professionals, including lawyers."  Id. at 52.  The schemes assume many forms, one in particular that is "particularly wicked" is the

"mortgage rescue" or "foreclosure fraud." Id. "Scammers prey on borrowers already facing foreclosure with phony promises to keep the bank at bay." Id.

32.     "What they're doing, by hook or crook, is getting the homeowner's title. In reality, very few people get their homes back and they lose the equity in them, because that's what it's all about – sucking the equity out." Id.

33.     On or about January 2005, roughly one month after the December 2004 deed transfer meeting, ROSEANN sent PLAINTIFFS a letter detailing PLAINTIFFS' portion of the new mortgage payments. According to the letter, PLAINTIFFS were now responsible for paying $1265 per month toward the new mortgage, roughly the same amount as the payments they had been having difficulty making prior to the "Program."

34.     Further according to the letter, the remaining monthly payment due toward the new mortgage – $1265 – would "be paid directly from our subsidy account," which as detailed in the handout received earlier from ROSEANN apparently would be from PLAINTIFFS' own equity in their home. Thus, in actuality, PLAINTIFFS were being required to pay $2530 per month.

35.     This of course was not clearly told to PLAINTIFFS. Nor were they told exactly how much of their equity was left after the closing. Nor how long the equity would last. Nor about any of the fees incurred. PLAINTIFFS were excluded from all the details and results of the meeting.

36.     After receiving ROSEANN'S letter, and relying on her representations that PLAINTIFFS would be able improve their credit scores, pay off any other debt, and obtain a new job, such as with "McDonalds," with the help of the "Program," and reclaim their home after 12 to 18 months, PLAINTIFFS started making the $1265 per month

payments to ROSEANN. She presumably was than forwarding, on behalf of ROLLACK-PAYNE, the total payments to ARGENT.

37. The "Program" however never materialized. DEFENDANTS never provided any assistance to PLAINTIFFS to improve their credit or their living circumstances. At the same time, DEFENDANTS continued to lead PLAINTIFFS to believe that assistance was forthcoming. ROSEANN, through her various entities, including RPGROUP INC., periodically sent letters to PLAINTIFFS leading them to believe that assistance was on the way. For example, one letter asked the PLAINTIFFS to sign an authorization that would have allowed ROSEANN to speak with PLAINTIFFS' creditors. On information and belief, although PLAINTIFFS provided ROSEANN with the authorization, ROSEANN never contacted the creditors.

38. After over a year of making monthly payments to ROSEANN, and after receiving repeated information by ROSEANN and her various entities that distorted the actual assistance PLAINTIFFS were receiving, PLAINTIFFS received a "Residential Rental Agreement." The Agreement was for a month to month lease that would commence on March 1, 2006, one year and three months after the December 2004 deed transfer meeting. According to the Agreement, monthly rent would be $2547.48, nearly twice PLAINTIFFS' old monthly mortgage rate. Also according to the Agreement, utilities and other living expenses were to be born by PLAINTIFFS.

39. PLAINTIFFS immediately objected to the agreement. ROSEANN however wrote to them that the "credit repair and loan status" was in progress and that she would keep PLAINTIFFS up to date.

40.     After the passing of a few months, after the expiration of the original 18 months promised at the initial meeting that PLAINTIFFS would have their home returned to them, PLAINTIFFS stopped making their monthly payments to ROSEANN.

41.     As expected, ROSEANN immediately sold the property for $395,000, reaping a profit of more than $100,000.

## COUNT ONE

### EQUITABLE MORTGAGE UNDER NY REAL PROPERTY LAW § 320

42.     PLAINTIFFS repeat herein each and every paragraph stated above.

43.     The December 2004 deed transfer from PLAINTIFFS to SHARON ROLLACK PAYNE is an equitable mortgage pursuant to NY Real Property Law § 320.

44.     Section 320 provides  that a "deed conveying real property, which by any other instrument, appears to be intended only as a security in the nature of a mortgage, although an absolute conveyance in terms, must be considered as a mortgage."

45.     To establish that a deed was intended to be a security, "examination may be made not only of the deed and a written agreement executed at the same time, but also of oral testimony bearing on the intent of the parties and to a consideration of the surrounding circumstances and acts of the parties."  Henley v. Foreclosure Sales Inc., 39 A.D.3d 470, 470 (2d Dept. 2007).

46.      Factors to consider include whether the real property owner was permitted to remain on the property; obliged to maintain the property, including its expenses; required to pay rent, make lease payment, or remit any other type of payment to the security holder; commanded to relinquish the property to security holder upon

default; and allowed to repurchase the property upon certain terms.  <u>Chase National Bank v. Tover</u>, 245 A.D. 615, 620 (1st Dept. 1935).

47.    Here, after the 2004 deed transfer to SHARON ROLLACK PAYNE, PLAINTIFFS were permitted to remain on the property and indeed did so and remain there today; PLAINTIFFS were obliged to maintain the property, including all expenses such as gas, electric, phone, and cable, and indeed did so and continue to do so; PLAINTIFFS were required to make lease payments, first at a rate of $1264.61 per month, then of $2547.48 per month; PLAINTIFFS were commanded to relinquish the property to PAYNE upon default as per ROSEANN'S handout; and, finally, PLAINTIFFS were allowed to repurchase the property as per ROSEANN'S handout.

48.    Accordingly, the 2004 deed transfer created an equitable mortgage pursuant to NY Real Property Law § 320.

49.    As such, PLAINTIFFS are entitled to a declaration declaring that the 2004 deed transfer is a mortgage and that PLAINTIFFS are entitled to all the rights and remedies accorded to them under state and federal law.

50.    In addition, PLAINTIFFS seek to invoke the Court's equitable powers to fashion a remedy that restores plaintiffs to their position prior to the 2004 deed transfer, including deeming the transfer null and void.

**COUNT TWO**

**TRUTH IN LENDING ACT**

51.    PLAINTIFFS repeat herein each and every paragraph stated above.

52.    DEFENDANTS were creditors who regularly engaged in the making of equitable mortgage loans, payable by agreement in more than four installments or for

which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise. Accordingly, defendants are subject to the Truth in Lending Act.

53.    As a result of the subject transaction, defendants acquired an interest in plaintiffs' home that secures payment or performance of an obligation.

54.    Upon information and belief, in the course of the December 2004 consumer credit transaction described above, DEFENDANTS violated the disclosure and rescission requirement of TILA in the following and other respects:

a.    By failing to disclose properly and accurately the amount financed, in violation of 15 U.S.C. § 1638(a)(2) and 12 C.F.R. § 226.18(b);

b.    By failing to disclose properly and accurately the finance charge fees payable to third parties that were not bona fide or reasonable in amount, as required by 15 U.S.C. § 1638(a)(3) and 12 C.F.R. §§ 226.18(d) & 226.4;

c.    By failing to disclose properly and accurately the "annual percentage rate" in violation of 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 226.18(e);

d.    By failing to disclose properly and accurately the "total of payments" in violation of 15 U.S.C. § 1638(a)(5) and 12 C.F.R. § 226.18(h);

e.    By failing to disclose properly and accurately the number, amount, and due dates or period of payments scheduled to repay the obligation in violation of 15 U.S.C. § 1638(a)(6) and 12 C.F.R. § 226.18(g);

f.    By failing to disclose that a security interest was taken in the subject property in violation of 15 U.S.C. § 1638(a)(9) and 12 C.F.R. § 226.18(m);

g.     By failing to provide two copies of the notice of the right to rescind and an accurate date for the expiration of the rescission period in violation of 15 U.S.C. § 1635 and 12 C.F.R. § 226.23(b);

h.     By failing to delay disbursement of funds to Chase Manhattan, Argent, and others until after the expiration of the rescission period in violation of 12 C.F.R. § 226.23(c); and

i.     By failing to return to plaintiffs "any money or property given as earnest money, down payment or otherwise," and failing to "take any action necessary or appropriate to reflect the termination of any security interest created under the transaction" when plaintiffs requested rescission of the mortgage, in violation of 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.23(d).

55.    The above violations of the Truth in Lending Act give plaintiffs an extended right to rescind the equitable loan held by defendants pursuant to 15 U.S.C. §§ 1635 & 1641(d)(l) and 12 C.F.R. § 226.23.

56.    In addition, DEFENDANTS are liable to PLAINTIFFS for: (a) the return of any money or property that has been given to anyone in connection with the transaction and the termination of DEFENDANTS' security interest in the property; (b) actual damages in an amount to be determined at trial; (c) statutory damages as provided by 15 U.S.C. § 1640; (d) costs and disbursements; and (e) attorneys' fees

## COUNT THREE

## REAL ESTATE SETTLEMENT PROCEDURES ACT

57.    PLAINTIFFS repeat herein each and every paragraph stated above.

58.    The December 2004 equitable mortgage transaction described above, in which plaintiffs allegedly deeded their property, is a loan secured by a first lien, the proceeds of which were used to pay off plaintiffs' mortgage with Chase Manhattan.

59.    Upon information and belief, defendants are creditors who make or invest in (equitable) mortgage loans aggregating more than $1,000,000 per year.

60.    The December 2004 equitable mortgage transaction described above is a "federally related mortgage loan" as defined in 12 U.S.C. § 2602(1), and therefore is subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.*

61.    Defendants violated RESPA with respect to plaintiffs' loan transaction by: (a) giving or accepting kickbacks or other things of value to various defendants, and others in violation of 12 U.S.C. § 2607(a) and 24 C.F.R. § 3500.14(c); and (b) giving a portion, split, or percentage of charges made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed, in violation of 12 U.S.C. § 2607(a) and 24 C.F.R. § 3500.14(c).

62.    Defendants are liable to plaintiffs for: (a) actual damages, trebled under 12 U.S.C. § 2607(d)(2); (b) costs and disbursements; and (c) attorneys' fees.

### COUNT FOUR

### NEW YORK STATE GENERAL BUSINESS LAW § 349 ("THE DECEPTIVE PRACTICES ACT")

63.    PLAINTIFFS repeat herein each and every paragraph stated above.

64.    Upon information and belief, defendants "conducted a business" and/or "furnished a service" as those terms are defined in New York State General Business Law § 349 (the "Deceptive Practices Act").

65.    The non-Argent defendants violated the Deceptive Practices Act by engaging in acts and practices that were misleading in a material way, unfair, deceptive, and contrary to public policy and generally recognized standards of business. These practices and acts include, but are not limited to, the following:

a.    Misrepresenting to plaintiffs at the time of the subject transaction that they would retain ownership of their home, when in fact they fraudulently induced plaintiffs to transfer title;

b.    Misrepresenting to plaintiffs the nature of the documents they were signing and the nature and details of the transaction in order to take title to plaintiffs' home and steal their equity;

c.    Falsely advertising "foreclosure rescue" services in the course of conducting business, trade, or commerce in the State of New York;

d.    Fraudulently notarizing plaintiffs' signatures on the deed documents in order to legitimize the transfer of their property.

66.    In addition, Argent violated the Deceptive Practices Act by engaging in acts and practices that were misleading in a material way, unfair, deceptive, and contrary to public policy and generally recognized standards of business. These practices and acts include, but are not limited to, the following:

a.    Securing a mortgage on plaintiffs' home before DEFENDANT PAYNE possessed title to the property; and

b.      Securing a mortgage on plaintiffs' home with the knowledge that the deed transfer from plaintiffs was fraudulent.

67.      Plaintiffs suffered serious injury as the proximate result of defendants' deceptive practices.

68.      Defendants' practices have had and may continue to have a broad impact on consumers throughout New York State.

69.      Defendants are liable to plaintiffs for: (a) actual damages; (b) costs and disbursements; and (c) attorneys' fees

## COUNT FIVE

## FRAUD

70.      PLAINTIFFS repeat herein each and every paragraph stated above.

71.      Defendants fraudulently and knowingly induced plaintiffs to enter the December 2004 equitable mortgage/deed transfer by making intentional misrepresentations and/or failing to provide material information, including but not limited to the following:

a.      Misrepresenting to plaintiffs that they were foreclosure rescue, refinance and credit repair specialists;

b.      Misrepresenting to plaintiffs at the time of the subject transaction that they would retain ownership of their home, when in fact they fraudulently induced plaintiffs to transfer title;

c.      Misrepresenting to plaintiffs the nature of the documents they were signing and the nature and details of the transaction;

d.      Falsely notarizing plaintiffs' signatures;

e.      Failing to inform plaintiffs that DEFENDANT PAYNE intended to, and in fact did, mortgage the property;

f.      Providing Argent with a security interest in plaintiffs' property.

72.     In addition, defendants fraudulently and knowingly conveyed or caused to be conveyed a security interest in plaintiffs' property to Argent by making intentional misrepresentations and/or failing to provide material information, including but not limited to the submission of a loan application to Argent on behalf of DEFENDANT PAYNE when defendants knew that she had fraudulently obtained title to plaintiffs' property.

73.     Plaintiffs suffered serious injury as the proximate result of their reliance on defendants' intentional misrepresentations and failures to disclose.  Plaintiffs' injuries include, but are not limited to, having their deed stolen from them, having a substantial lien  placed on their home in the form of a mortgage; facing the uncertainty of foreclosure and eviction; loss of rental income and other lost opportunities; mental and physical anguish; and other damages.

74.     Defendants' actions were willful, intentional and knowing, rendering the December 2004 equitable loan/deed transfer and Argent mortgage null and void.

75.     In addition, defendants are liable to plaintiffs for: (a) actual damages; (b) punitive damages, (c) costs and disbursements; and (d) attorneys' fees.

### COUNT SIX

### CIVIL CONSPIRACY TO COMMIT FRAUD

76.     PLAINTIFFS repeat herein each and every paragraph stated above.

77.     Defendants entered into an agreement to induce plaintiffs to enter the December 2004 equitable mortgage/deed transfer transaction and to re-mortgage plaintiffs' property.

78.     Defendants intentionally, knowingly and willfully participated in this scheme by committing overt acts and making misrepresentations and/or failing to provide material information, in furtherance of the agreement, including but not limited to those representations set forth in the paragraphs above.

79.     Plaintiffs suffered serious injury as the proximate result of their reliance on defendants' misrepresentations and omissions.

80.     Said conspiracy renders void and unenforceable the December 2004 equitable mortgage/deed transfer.

81.     In addition, defendants are liable to plaintiffs for: (a) actual damages; (b) punitive damages, (c) costs and disbursements; and (d) attorneys' fees.

## COUNT SEVEN Against Argent

### NEGLIGENCE

82.     PLAINTIFFS repeat herein each and every paragraph stated above.

83.     Argent had actual and or constructive notice and or knowledge of plaintiffs' interest in the subject property, based on warning flags, including but not limited to (a) plaintiffs' actual, open, and visible possession of the subject property before, during, and after Argent's mortgage; (b) the fact that title had not been conveyed; (c) the comments made at the December 2004 meeting; (d) exceptions to Argent's title insurance policy based on an unrecorded written agreement purporting to return the subject property to plaintiffs within 18 months.

84. Argent's knowledge imposed upon them a duty to the plaintiffs to investigate the existence, nature, and scope of plaintiffs' interest in the subject property before encumbering it with a lien.

85. Argent breached this duty by, among other things: (a) failing to investigate whether or not PAYNE possessed a bona fide title to the subject property at the time of the mortgage; (b) failing to investigate why PAYNE was willing to purchase such an expensive mortgage; (c) failing to investigate why PAYNE was not currently living, or expecting to live, at the subject property; (d) failing to investigate why parties other than PAYNE--i.e., plaintiffs-were currently living at the subject property; (e) failing to investigate the relationship, if any, between plaintiffs and PAYNE; (f) ignoring the inconsistent notarizations on the deed documents; (g) failing to discuss directly with plaintiffs their relation, if any, to PAYNE, their interest in the subject property, or their attitude (approval or disapproval) toward the mortgage that PAYNE sought to place on their property; (h) failing to investigate the exceptions to its title insurance policy

86. It was foreseeable that plaintiffs would be injured if Argent failed to adequately investigate the above matters, and then filed a lien purporting to encumber the entire property.

87. Plaintiffs suffered serious injury as the actual and proximate result of Argent's breach of its duty of investigation.

88. As a result, Argent's purported lien against the property should be declared void, and Argent is liable to plaintiffs for (a) actual damages; (b) costs and disbursements; and (c) attorneys' fees.

**COUNT EIGHT Against Argent**

## AIDING AND ABETTING FRAUD

89.    PLAINTIFFS repeat herein each and every paragraph stated above.

90.    At all times relevant hereto, Argent, by and through its affiliates, divisions, enterprises, representatives, employees and agents, knowingly and willfully aided and abetted the fraudulent foreclosure rescue scheme described above.

91.    Argent's actions were taken with full knowledge and acceptance of the fraudulent foreclosure rescue scheme, which enabled Argent to take a security interest in plaintiffs' property and collect other fees and income.

92.    Argent aided and abetted the scheme to defraud plaintiffs by providing substantial assistance to defendants. This substantial assistance included, among other things: (a) providing the funds used to originate PAYNE'S loan; (b) approving submission of incomplete and inaccurate loan applications (c) promoting and encouraging minimal underwriting standards; (d) failing to conduct adequate due diligence before securing a mortgage on plaintiffs' property; and (e) securing a mortgage on plaintiffs' property with the knowledge that PAYNE had obtained title by fraudulent means.

93.    Argent obtained constructive and actual knowledge of the fraudulent foreclosure rescue scheme described above.

94.    As a direct and proximate result of said aiding and abetting, plaintiffs suffered serious injury.

95.    Without Argent's substantial assistance, involvement, and participation, the fraudulent foreclosure rescue scheme would not have been possible.

## COUNT NINE

## NEW YORK REAL PROPERTY ACTIONS AND PROCEEDINGS LAW,
## ARTICLE 15

96.    PLAINTIFFS repeat herein each and every paragraph stated above.

97.    Plaintiffs bring this claim pursuant to Article 15 of the New York State Real Property Actions and Proceeding Law to compel the determination of any claims adverse to those of plaintiffs. Through this action, plaintiffs seek to quiet title to the subject property by having declared as void the fraudulent deed transfer from plaintiffs to PAYNE, and also any subsequent transfer.

98.    Plaintiffs are the sole owners of the property.

99.    Public records suggest that defendant PAYNE may claim an interest in the property. Her purported interest, and the documents upon which it rests, are void because they were obtained through a conspiratorial and fraudulent scheme that tricked plaintiffs into conveying ownership of their home without their knowledge. Alternatively, the deed transfer constituted an equitable mortgage and not a deed transfer.

100.    Argent may claim that it has a lien against the property.  However, PAYNE has no valid interest in the property to give Argent. Further, as described above, Argent gave a mortgage to PAYNE when she did not possess legal title; Argent failed to ascertain that plaintiffs were plainly in actual, open, and visible possession and ownership of the property.

101.    Accordingly, plaintiffs request that this Court issue: (a) a declaration that plaintiffs are the lawful sole owners of the property and are entitled to lawful, peaceable, and uninterrupted possession thereof as against all defendants herein, and as against anyone claiming under them; (b) an injunction prohibiting all defendants, and every

person claiming under them, from claiming an estate or interest in, or lien or encumbrance on, the property; (c) a judgment declaring as void the fraudulent deed purporting to transfer plaintiffs' interest in the property; (d) a judgment declaring as void the mortgage claimed by Argent against the property; (e) damages stemming from plaintiffs' lost rents and other damage in connection with the loss of their exclusive right to use the property in the manner of their choosing; and (f) any other relief that this Court deems just and proper.

## DEMAND

102.    Plaintiff demands judgment against defendants for relief consistent with the law available under each claim and for such other and further relief as may be just.


Dated: New York, New York
        December 5, 2007


                        **KOEHLER & ISAACS LLP**
                        Attorneys for Plaintiffs
                        61 Broadway, 25th Floor
                        New York, NY 10006
                        917 551 1353


                        By:    _____/s_____
                              **MATHEW PAULOSE JR., ESQ. (MP6002)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**
-----------------------------------------------------------x

IVY & WILLIAM GOODWIN,

              Plaintiffs,

                    Index No. 07CV11048
        -against-           (LAP)(GWG)

ROSEANN PALIOTTA, PAUL PALIOTTA, RAC     **COMPLAINT**
REALTY ADVISORS, FORECLOSURE
SOLUTIONS, RPGROUP INC., SHARON
ROLLACK-PAYNE, HOCHBAUM WEISS,
BARRY C. WEISS, ARGENT MORTGAGE CO.
LLC,

              Defendants.

-----------------------------------------------------------x

## INTRODUCTION

1.    This is an action brought for mortgage and foreclosure fraud under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 et seq., the Truth in Lending Act (TILA), 15 U.S.C § 1640, NY Real Property Law § 320, NY Real Property Law Article 15, NY State General Business Law § 349, and the common law claims of Fraud, Conspiracy to Commit Fraud, Aiding and Abetting Fraud, Negligence, Malpractice.  PLAINTIFFS allege that DEFENDANTS defrauded them into transferring their home to a straw buyer, stripping them of their equity, and purportedly selling their home.  PLAINTIFFS seek equitable relief, compensatory damages, punitive damages, costs, and fees.  PLAINTIFFS' equitable relief would restore them as the rightful owners of their home.

## JURISDICTION

2.      The court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 as the action arises under the laws of the United States.  The court has jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 as the state claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

## PARTIES

3.      PLAINTIFFS are owners of a house located 4723 Bronx Boulevard, Bronx, NY 10469.  PLAINTIFFS are currently 60 years of age or older.  PLAINTIFF Ivy Goodwin was employed for more than 20 years at St. Luke's-Roosevelt Hospital as a secretary earning roughly $33,000 per year.  In or about 2002, Ms. Goodwin was laid off from her position and has not been able to find a position elsewhere.  PLAINTIFF William Goodwin is presently employed as a food service operator for Memorial Sloan Kettering Hospital earning roughly $40,000 per year.

4.      DEFENDANT RAC REALTY ADVISORS is a self proclaimed "real estate money management firm" owned and operated by ROSEANN and PAUL PALIOTTA, who live on Long Island, New York.  DEFENDANT RAC REALTY ADVISORS is not registered with the NYS Department of State.  Its address is unknown.

5.      DEFENDANT FORECLOSURE SOLUTIONS is a subsidiary of RAC REALTY ADVISORS, and is owned and operated by ROSEANN and PAUL PALIOTTA.  There are at least four entities under the same or similar name registered with the NYS Department of State, none of them with the same address as DEFENDANT

FORECLOSURE SOLUTIONS, which purportedly does business at 40 Pacific Street, North Babylon, NY 11703.

6.    DEFENDANT RPGROUP INC. is owned and operated also by ROSEANN PALIOTTA.  It is not registered with the NYS Department of State.  Its address is unknown.

7.    DEFENDANT SHARON ROLLACK-PAYNE is the straw buyer of PLAINTIFFS' home.  She resides at 170 Connecticut Avenue, Freeport, NY 11520.

8.    HOCHBAUM WEISS is the law firm that assisted the DEFENDANTS in the fraud as alleged herein.  BARRY C. WEISS is a partner at the firm.  The firm's address is 30 Jericho Executive Plaza, Suite 100E, Jericho, NY 11753.

9.    ARGENT MORTGAGE CO. LLC is one of the largest subprime lenders in the country.  It is responsible for providing financing support in the fraud as alleged herein.  It is located at 333 Westchester Avenue, 1st Floor, White Plains, NY 10604. JANE DOE is the attorney for ARGENT that appeared on its behalf during the transactions alleged herein.

**BACKGROUND**

10.    In early 1999, after roughly seven years of renting an apartment in the Bronx, New York, PLAINTIFFS embarked on the first step to the American dream of home ownership.

11.    On February 25, 1999, with the help of a community service agency called Community Resource Mortgage ("CRM"), PLAINTIFFS found and purchased a home located at 4723 Bronx Boulevard, Bronx, NY 10469 (Block 5102, Lot 17).

12.    PLAINTIFFS mortgaged the home for $185,905 from American Brokers Conduit, with monthly payments at or around $1375.

13.    In or about 2002, after PLAINTIFF Ivy Goodwin was unfortunately laid off from work, the PLAINTIFFS started falling behind on their mortgage payments.

14.    On March 23, 2004, PLAINTIFFS obtained assistance from the Department of Housing and Urban Development and mortgaged their home for a second time for around $11,954, a mortgage serviced by Chase Manhattan Mortgage Corporation.

15.    On October 28, 2004, after PLAINTIFFS continued to have difficulty meeting their daily expenses, including payment of their mortgages, American Brokers Conduit filed suit against PLAINTIFFS for nonpayment of the mortgage.

16.    In late 2004, PLAINTIFFS sought again the help of CRM.  There, a person by the name of ROBERT F. referred PLAINTIFFS to an entity called RAC REALTY ADVISORS, a self proclaimed "real estate money management firm" owned and operated by ROSEANN and PAUL PALIOTTA.  For the referral, ROBERT F. received an undisclosed amount of money.

17.    In or about October 2004, ROSEANN PALIOTTA arranged to meet with PLAINTIFFS at CRM.

18.    There, ROSEANN informed the PLAINTIFFS that her organization had a group of "private investors" who could help the PLAINTIFFS resolve their mortgage problems.  ROSEANN informed the PLAINTIFFS that the "private investors" functioned as "guardian angels" and helped "so many clients stay in their home."  She informed PLAINTIFFS that "it's all perfectly legal."

19.    ROSEANN proceeded to convince the PLAINTIFFS to enter into a "Program," maintained by a RAC REALTY ADVISORS subsidiary called FORECLOSURE SOLUTIONS, also owned and operated by ROSEANN and PAUL PALIOTTA. The Program required PLAINTIFFS to transfer, not sell, ownership of their home to a third party (a "straw buyer"), who would not live in the home, but would merely function as a person with sufficient credit who could obtain a new mortgage that would enable the PLAINTIFFS' mortgage to be paid off. ROSEANN, as agent of the third party, would then hold the remaining monies obtained from the new mortgage above and beyond the old mortgage for a period of 12 to 18 months. These monies, less any fees owed to ROSEANN, RAC REALTY ADVISORS, and FORECLOSURE SOLUTIONS and others, would be used to help PLAINTIFFS pay the new mortgage. In the meantime, ROSEANN would assist the PLAINTIFFS improve their credit scores, pay off any other debt, and obtain a new job, such as with "McDonalds." Upon expiration of the 12 to 18 months, the home would then be transferred back to the PLAINTIFFS through a new mortgage that they would obtain in their own name and that they would be able to afford. Throughout the life of the "Program," plaintiffs would remain in their home and continue to live normally, paying living expenses and enjoying the use of their home.

20.    ROSEANN provided PLAINTIFF with a handout that purportedly described the "Program." According to the handout (all parentheticals in original):

Utilizing a "trustee" borrower (a new individual with excellent credit rating) we payoff the foreclosing lender by creating a "friendly purchase" (since refinancing would not be allowable by the lending community, otherwise known as a "bailout"). We are now able to finance enough to create a "mortgage subsidy account" (additional funds set aside

in an escrow account) which may only be used to subsidize mortgage payments for a period of up to 2 years.

First all the funds above and beyond closing costs and credit enhancement/administration fees, will be maintained in a designated account which cannot be accessed for any purpose other than loan payment servicing. In the event the individual falls behind sufficiently and has no way of bringing current the new loan deficiency, the "trustee" has authority to liquidate the property in order to pay off the lending intuition and any/all remaining escrowed funds, as well as profit upon sale, will be remitted to that individual.

21.     After this initial meeting, ROSEANN repeatedly telephoned the PLAINTIFFS. She informed them again that the Program was "perfectly legal." She informed them that the PLAINTIFFS would "stay in [their] home;" that they "were in charge;" and that they "would call the shots."

22.     In or about November 2004, encouraged by ROSEANN's repeated representations, the PLAINTIFFS agreed to allow ROSEANN to enter them into the Program.

23.     In or about December 3, 2004, ROSEANN directed the PLAINTIFFS to a meeting where several unknown persons were present.

24.     Leading the meeting was PAUL PALIOTTA, ROSEANN'S husband and business partner. Also present was a lawyer by the name of BARRY C. WEISS, who introduced himself to the PLAINTIFFS as their lawyer. There was also a person by the name of SHARON ROLLACK PAYNE, who plaintiffs learned at the meeting would be the purchaser, that is, the straw buyer. Finally, there was present another attorney, JANE DOE, representing ARGENT MORTGAGE CO LLC.

25.     The PLAINTIFFS were first directed into a private room by "their lawyer." He proceeded to instruct the PLAINTIFFS not to make eye contact with anyone

in the room.  He also instructed them not to speak to each other or with anyone else.  He also instructed them not to ask any questions.  Finally, he instructed them that their only responsibility was to sign any paper he put in front of them.  Specifically, he instructed them not to touch any of the checks.

26.    After being brought back into the conference room, PLAINTIFFS were ushered to their seats.  In short time, PLAINTIFFS were handed several documents to sign.  Meanwhile, other documents and checks were crossing the table.  At one moment, PLAINTIFFS saw a check cross the table for a significant dollar amount.  PLAINTIFF IVY GOODWIN spoke up and asked, "after 12 to 18 months, we're getting our house back, right?"  Their purported lawyer shot a look at her to be silent.

27.    At this time, JANE DOE also shot a look at them.

28.    She, however, just frowned and went back to processing the paperwork.

29.    JANE DOE did not stop the proceedings although she knew that she could not process the paperwork if she had information that the transaction was not a true sale and purchase agreement.

30.    A few minutes later, PLAINTIFFS were ushered out the door, without any documents, and without any information.

31.    "Scams and real estate have been partners for a long time."  John Gibeaut, Mortgage Fraud Mess, ABA Journal at 51 (July 2007).  But recently, the scams have targeted "individual borrowers, especially longtime homeowners who find themselves in financial distress.  These schemes are carried out by rings that may encompass lenders, brokers, appraisers, and other real estate professionals, including lawyers."  Id. at 52.  The schemes assume many forms, one in particular that is "particularly wicked" is the

"mortgage rescue" or "foreclosure fraud."  Id.  "Scammers prey on borrowers already facing foreclosure with phony promises to keep the bank at bay."  Id.

32.    "What they're doing, by hook or crook, is getting the homeowner's title. In reality, very few people get their homes back and they lose the equity in them, because that's what it's all about – sucking the equity out."  Id.

33.    On or about January 2005, roughly one month after the December 2004 deed transfer meeting, ROSEANN sent PLAINTIFFS a letter detailing PLAINTIFFS' portion of the new mortgage payments.  According to the letter, PLAINTIFFS were now responsible for paying $1265 per month toward the new mortgage, roughly the same amount as the payments they had been having difficulty making prior to the "Program."

34.    Further according to the letter, the remaining monthly payment due toward the new mortgage – $1265 – would "be paid directly from our subsidy account," which as detailed in the handout received earlier from ROSEANN apparently would be from PLAINTIFFS' own equity in their home.  Thus, in actuality, PLAINTIFFS were being required to pay $2530 per month.

35.    This of course was not clearly told to PLAINTIFFS.  Nor were they told exactly how much of their equity was left after the closing.  Nor how long the equity would last.  Nor about any of the fees incurred.  PLAINTIFFS were excluded from all the details and results of the meeting.

36.    After receiving ROSEANN'S letter, and relying on her representations that PLAINTIFFS would be able improve their credit scores, pay off any other debt, and obtain a new job, such as with "McDonalds," with the help of the "Program," and reclaim their home after 12 to 18 months, PLAINTIFFS started making the $1265 per month

8

payments to ROSEANN.   She presumably was than forwarding, on behalf of ROLLACK-PAYNE, the total payments to ARGENT.

37.     The "Program" however never materialized.   DEFENDANTS never provided any assistance to PLAINTIFFS to improve their credit or their living circumstances.   At the same time, DEFENDANTS continued to lead PLAINTIFFS to believe that assistance was forthcoming.   ROSEANN, through her various entities, including RPGROUP INC., periodically sent letters to PLAINTIFFS leading them to believe that assistance was on the way.   For example, one letter asked the PLAINTIFFS to sign an authorization that would have allowed ROSEANN to speak with PLAINTIFFS' creditors.   On information and belief, although PLAINTIFFS provided ROSEANN with the authorization, ROSEANN never contacted the creditors.

38.     After over a year of making monthly payments to ROSEANN, and after receiving repeated information by ROSEANN and her various entities that distorted the actual assistance PLAINTIFFS were receiving, PLAINTIFFS received a "Residential Rental Agreement."   The Agreement was for a month to month lease that would commence on March 1, 2006, one year and three months after the December 2004 deed transfer meeting.   According to the Agreement, monthly rent would be $2547.48, nearly twice PLAINTIFFS' old monthly mortgage rate.   Also according to the Agreement, utilities and other living expenses were to be born by PLAINTIFFS.

39.     PLAINTIFFS immediately objected to the agreement.   ROSEANN however wrote to them that the "credit repair and loan status" was in progress and that she would keep PLAINTIFFS up to date.

40.      After the passing of a few months, after the expiration of the original 18 months promised at the initial meeting that PLAINTIFFS would have their home returned to them, PLAINTIFFS stopped making their monthly payments to ROSEANN.

41.      As expected, ROSEANN immediately sold the property for $395,000, reaping a profit of more than $100,000.

## COUNT ONE

## EQUITABLE MORTGAGE UNDER NY REAL PROPERTY LAW § 320

42.      PLAINTIFFS repeat herein each and every paragraph stated above.

43.      The December 2004 deed transfer from PLAINTIFFS to SHARON ROLLACK PAYNE is an equitable mortgage pursuant to NY Real Property Law § 320.

44.      Section 320 provides  that a "deed conveying real property, which by any other instrument, appears to be intended only as a security in the nature of a mortgage, although an absolute conveyance in terms, must be considered as a mortgage."

45.      To establish that a deed was intended to be a security, "examination may be made not only of the deed and a written agreement executed at the same time, but also of oral testimony bearing on the intent of the parties and to a consideration of the surrounding circumstances and acts of the parties."  Henley v. Foreclosure Sales Inc., 39 A.D.3d 470, 470 (2d Dept. 2007).

46.       Factors to consider include whether the real property owner was permitted to remain on the property; obliged to maintain the property, including its expenses; required to pay rent, make lease payment, or remit any other type of payment to the security holder; commanded to relinquish the property to security holder upon

default; and allowed to repurchase the property upon certain terms.  <u>Chase National Bank v. Tover</u>, 245 A.D. 615, 620 (1st Dept. 1935).

47.    Here, after the 2004 deed transfer to SHARON ROLLACK PAYNE, PLAINTIFFS were permitted to remain on the property and indeed did so and remain there today; PLAINTIFFS were obliged to maintain the property, including all expenses such as gas, electric, phone, and cable, and indeed did so and continue to do so; PLAINTIFFS were required to make lease payments, first at a rate of $1264.61 per month, then of $2547.48 per month; PLAINTIFFS were commanded to relinquish the property to PAYNE upon default as per ROSEANN'S handout; and, finally, PLAINTIFFS were allowed to repurchase the property as per ROSEANN'S handout.

48.    Accordingly, the 2004 deed transfer created an equitable mortgage pursuant to NY Real Property Law § 320.

49.    As such, PLAINTIFFS are entitled to a declaration declaring that the 2004 deed transfer is a mortgage and that PLAINTIFFS are entitled to all the rights and remedies accorded to them under state and federal law.

50.    In addition, PLAINTIFFS seek to invoke the Court's equitable powers to fashion a remedy that restores plaintiffs to their position prior to the 2004 deed transfer, including deeming the transfer null and void.

**COUNT TWO**

**TRUTH IN LENDING ACT**

51.    PLAINTIFFS repeat herein each and every paragraph stated above.

52.    DEFENDANTS were creditors who regularly engaged in the making of equitable mortgage loans, payable by agreement in more than four installments or for

which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise. Accordingly, defendants are subject to the Truth in Lending Act.

53.     As a result of the subject transaction, defendants acquired an interest in plaintiffs' home that secures payment or performance of an obligation.

54.     Upon information and belief, in the course of the December 2004 consumer credit transaction described above, DEFENDANTS violated the disclosure and rescission requirement of TILA in the following and other respects:

a.     By failing to disclose properly and accurately the amount financed, in violation of 15 U.S.C. § 1638(a)(2) and 12 C.F.R. § 226.18(b);

b.     By failing to disclose properly and accurately the finance charge fees payable to third parties that were not bona fide or reasonable in amount, as required by 15 U.S.C. § 1638(a)(3) and 12 C.F.R. §§ 226.18(d) & 226.4;

c.     By failing to disclose properly and accurately the "annual percentage rate" in violation of 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 226.18(e);

d.     By failing to disclose properly and accurately the "total of payments" in violation of 15 U.S.C. § 1638(a)(5) and 12 C.F.R. § 226.18(h);

e.     By failing to disclose properly and accurately the number, amount, and due dates or period of payments scheduled to repay the obligation in violation of 15 U.S.C. § 1638(a)(6) and 12 C.F.R. § 226.18(g);

f.     By failing to disclose that a security interest was taken in the subject property in violation of 15 U.S.C. § 1638(a)(9) and 12 C.F.R. § 226.18(m);

g.    By failing to provide two copies of the notice of the right to rescind and an accurate date for the expiration of the rescission period in violation of 15 U.S.C. § 1635 and 12 C.F.R. § 226.23(b);

h.    By failing to delay disbursement of funds to Chase Manhattan, Argent, and others until after the expiration of the rescission period in violation of 12 C.F.R. § 226.23(c); and

i.    By failing to return to plaintiffs "any money or property given as earnest money, down payment or otherwise," and failing to "take any action necessary or appropriate to reflect the termination of any security interest created under the transaction" when plaintiffs requested rescission of the mortgage, in violation of 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.23(d).

55.    The above violations of the Truth in Lending Act give plaintiffs an extended right to rescind the equitable loan held by defendants pursuant to 15 U.S.C. §§ 1635 & 1641(d)(l) and 12 C.F.R. § 226.23.

56.    In addition, DEFENDANTS are liable to PLAINTIFFS for: (a) the return of any money or property that has been given to anyone in connection with the transaction and the termination of DEFENDANTS' security interest in the property; (b) actual damages in an amount to be determined at trial; (c) statutory damages as provided by 15 U.S.C. § 1640; (d) costs and disbursements; and (e) attorneys' fees

## COUNT THREE

## REAL ESTATE SETTLEMENT PROCEDURES ACT

57.    PLAINTIFFS repeat herein each and every paragraph stated above.

58.    The December 2004 equitable mortgage transaction described above, in which plaintiffs allegedly deeded their property, is a loan secured by a first lien, the proceeds of which were used to pay off plaintiffs' mortgage with Chase Manhattan.

59.    Upon information and belief, defendants are creditors who make or invest in (equitable) mortgage loans aggregating more than $1,000,000 per year.

60.    The December 2004 equitable mortgage transaction described above is a "federally related mortgage loan" as defined in 12 U.S.C. § 2602(1), and therefore is subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.*

61.    Defendants violated RESPA with respect to plaintiffs' loan transaction by: (a) giving or accepting kickbacks or other things of value to various defendants, and others in violation of 12 U.S.C. § 2607(a) and 24 C.F.R. § 3500.14(c); and (b) giving a portion, split, or percentage of charges made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed, in violation of 12 U.S.C. § 2607(a) and 24 C.F.R. § 3500.14(c).

62.    Defendants are liable to plaintiffs for: (a) actual damages, trebled under 12 U.S.C. § 2607(d)(2); (b) costs and disbursements; and (c) attorneys' fees.

## COUNT FOUR

## NEW YORK STATE GENERAL BUSINESS LAW § 349 ("THE DECEPTIVE PRACTICES ACT")

63.    PLAINTIFFS repeat herein each and every paragraph stated above.

64.     Upon information and belief, defendants "conducted a business" and/or "furnished a service" as those terms are defined in New York State General Business Law § 349 (the "Deceptive Practices Act").

65.     The non-Argent defendants violated the Deceptive Practices Act by engaging in acts and practices that were misleading in a material way, unfair, deceptive, and contrary to public policy and generally recognized standards of business. These practices and acts include, but are not limited to, the following:

a.     Misrepresenting to plaintiffs at the time of the subject transaction that they would retain ownership of their home, when in fact they fraudulently induced plaintiffs to transfer title;

b.     Misrepresenting to plaintiffs the nature of the documents they were signing and the nature and details of the transaction in order to take title to plaintiffs' home and steal their equity;

c.     Falsely advertising "foreclosure rescue" services in the course of conducting business, trade, or commerce in the State of New York;

d.     Fraudulently notarizing plaintiffs' signatures on the deed documents in order to legitimize the transfer of their property.

66.     In addition, Argent violated the Deceptive Practices Act by engaging in acts and practices that were misleading in a material way, unfair, deceptive, and contrary to public policy and generally recognized standards of business. These practices and acts include, but are not limited to, the following:

a.     Securing a mortgage on plaintiffs' home before DEFENDANT PAYNE possessed title to the property; and

15

b.      Securing a mortgage on plaintiffs' home with the knowledge that the deed transfer from plaintiffs was fraudulent.

67.     Plaintiffs suffered serious injury as the proximate result of defendants' deceptive practices.

68.     Defendants' practices have had and may continue to have a broad impact on consumers throughout New York State.

69.     Defendants are liable to plaintiffs for: (a) actual damages; (b) costs and disbursements; and (c) attorneys' fees

## COUNT FIVE

## FRAUD

70.     PLAINTIFFS repeat herein each and every paragraph stated above.

71.     Defendants fraudulently and knowingly induced plaintiffs to enter the December 2004 equitable mortgage/deed transfer by making intentional misrepresentations and/or failing to provide material information, including but not limited to the following:

a.      Misrepresenting to plaintiffs that they were foreclosure rescue, refinance and credit repair specialists;

b.      Misrepresenting to plaintiffs at the time of the subject transaction that they would retain ownership of their home, when in fact they fraudulently induced plaintiffs to transfer title;

c.      Misrepresenting to plaintiffs the nature of the documents they were signing and the nature and details of the transaction;

d.      Falsely notarizing plaintiffs' signatures;

16

e.      Failing to inform plaintiffs that DEFENDANT PAYNE intended to, and in fact did, mortgage the property;

f.      Providing Argent with a security interest in plaintiffs' property.

72.     In addition, defendants fraudulently and knowingly conveyed or caused to be conveyed a security interest in plaintiffs' property to Argent by making intentional misrepresentations and/or failing to provide material information, including but not limited to the submission of a loan application to Argent on behalf of DEFENDANT PAYNE when defendants knew that she had fraudulently obtained title to plaintiffs' property.

73.     Plaintiffs suffered serious injury as the proximate result of their reliance on defendants' intentional misrepresentations and failures to disclose.  Plaintiffs' injuries include, but are not limited to, having their deed stolen from them, having a substantial lien  placed on their home in the form of a mortgage; facing the uncertainty of foreclosure and eviction; loss of rental income and other lost opportunities; mental and physical anguish; and other damages.

74.     Defendants' actions were willful, intentional and knowing, rendering the December 2004 equitable loan/deed transfer and Argent mortgage null and void.

75.     In addition, defendants are liable to plaintiffs for: (a) actual damages; (b) punitive damages, (c) costs and disbursements; and (d) attorneys' fees.

## COUNT SIX

## CIVIL CONSPIRACY TO COMMIT FRAUD

76.     PLAINTIFFS repeat herein each and every paragraph stated above.

17

77.     Defendants entered into an agreement to induce plaintiffs to enter the December 2004 equitable mortgage/deed transfer transaction and to re-mortgage plaintiffs' property.

78.     Defendants intentionally, knowingly and willfully participated in this scheme by committing overt acts and making misrepresentations and/or failing to provide material information, in furtherance of the agreement, including but not limited to those representations set forth in the paragraphs above.

79.     Plaintiffs suffered serious injury as the proximate result of their reliance on defendants' misrepresentations and omissions.

80.     Said conspiracy renders void and unenforceable the December 2004 equitable mortgage/deed transfer.

81.     In addition, defendants are liable to plaintiffs for: (a) actual damages; (b) punitive damages, (c) costs and disbursements; and (d) attorneys' fees.

## COUNT SEVEN Against Argent

## NEGLIGENCE

82.     PLAINTIFFS repeat herein each and every paragraph stated above.

83.     Argent had actual and or constructive notice and or knowledge of plaintiffs' interest in the subject property, based on warning flags, including but not limited to (a) plaintiffs' actual, open, and visible possession of the subject property before, during, and after Argent's mortgage; (b) the fact that title had not been conveyed; (c) the comments made at the December 2004 meeting; (d) exceptions to Argent's title insurance policy based on an unrecorded written agreement purporting to return the subject property to plaintiffs within 18 months.

84.     Argent's knowledge imposed upon them a duty to the plaintiffs to investigate the existence, nature, and scope of plaintiffs' interest in the subject property before encumbering it with a lien.

85.     Argent breached this duty by, among other things: (a) failing to investigate whether or not PAYNE possessed a bona fide title to the subject property at the time of the mortgage; (b) failing to investigate why PAYNE was willing to purchase such an expensive mortgage; (c) failing to investigate why PAYNE was not currently living, or expecting to live, at the subject property; (d) failing to investigate why parties other than PAYNE--i.e., plaintiffs-were currently living at the subject property; (e) failing to investigate the relationship, if any, between plaintiffs and PAYNE; (f) ignoring the inconsistent notarizations on the deed documents; (g) failing to discuss directly with plaintiffs their relation, if any, to PAYNE, their interest in the subject property, or their attitude (approval or disapproval) toward the mortgage that PAYNE sought to place on their property; (h) failing to investigate the exceptions to its title insurance policy

86.     It was foreseeable that plaintiffs would be injured if Argent failed to adequately investigate the above matters, and then filed a lien purporting to encumber the entire property.

87.     Plaintiffs suffered serious injury as the actual and proximate result of Argent's breach of its duty of investigation.

88.     As a result, Argent's purported lien against the property should be declared void, and Argent is liable to plaintiffs for (a) actual damages; (b) costs and disbursements; and (c) attorneys' fees.

### COUNT EIGHT Against Argent

19

## AIDING AND ABETTING FRAUD

89.    PLAINTIFFS repeat herein each and every paragraph stated above.

90.    At all times relevant hereto, Argent, by and through its affiliates, divisions, enterprises, representatives, employees and agents, knowingly and willfully aided and abetted the fraudulent foreclosure rescue scheme described above.

91.    Argent's actions were taken with full knowledge and acceptance of the fraudulent foreclosure rescue scheme, which enabled Argent to take a security interest in plaintiffs' property and collect other fees and income.

92.    Argent aided and abetted the scheme to defraud plaintiffs by providing substantial assistance to defendants. This substantial assistance included, among other things: (a) providing the funds used to originate PAYNE'S loan; (b) approving submission of incomplete and inaccurate loan applications (c) promoting and encouraging minimal underwriting standards; (d) failing to conduct adequate due diligence before securing a mortgage on plaintiffs' property; and (e) securing a mortgage on plaintiffs' property with the knowledge that PAYNE had obtained title by fraudulent means.

93.    Argent obtained constructive and actual knowledge of the fraudulent foreclosure rescue scheme described above.

94.    As a direct and proximate result of said aiding and abetting, plaintiffs suffered serious injury.

95.    Without Argent's substantial assistance, involvement, and participation, the fraudulent foreclosure rescue scheme would not have been possible.

### COUNT NINE

20

## NEW YORK REAL PROPERTY ACTIONS AND PROCEEDINGS LAW,
## ARTICLE 15

96.    PLAINTIFFS repeat herein each and every paragraph stated above.

97.    Plaintiffs bring this claim pursuant to Article 15 of the New York State Real Property Actions and Proceeding Law to compel the determination of any claims adverse to those of plaintiffs. Through this action, plaintiffs seek to quiet title to the subject property by having declared as void the fraudulent deed transfer from plaintiffs to PAYNE, and also any subsequent transfer.

98.    Plaintiffs are the sole owners of the property.

99.    Public records suggest that defendant PAYNE may claim an interest in the property. Her purported interest, and the documents upon which it rests, are void because they were obtained through a conspiratorial and fraudulent scheme that tricked plaintiffs into conveying ownership of their home without their knowledge. Alternatively, the deed transfer constituted an equitable mortgage and not a deed transfer.

100.    Argent may claim that it has a lien against the property.  However, PAYNE has no valid interest in the property to give Argent. Further, as described above, Argent gave a mortgage to PAYNE when she did not possess legal title; Argent failed to ascertain that plaintiffs were plainly in actual, open, and visible possession and ownership of the property.

101.    Accordingly, plaintiffs request that this Court issue: (a) a declaration that plaintiffs are the lawful sole owners of the property and are entitled to lawful, peaceable, and uninterrupted possession thereof as against all defendants herein, and as against anyone claiming under them; (b) an injunction prohibiting all defendants, and every

person claiming under them, from claiming an estate or interest in, or lien or encumbrance on, the property; (c) a judgment declaring as void the fraudulent deed purporting to transfer plaintiffs' interest in the property; (d) a judgment declaring as void the mortgage claimed by Argent against the property; (e) damages stemming from plaintiffs' lost rents and other damage in connection with the loss of their exclusive right to use the property in the manner of their choosing; and (f) any other relief that this Court deems just and proper.

## DEMAND

102.    Plaintiff demands judgment against defendants for relief consistent with the law available under each claim and for such other and further relief as may be just.


Dated: New York, New York
          December 5, 2007


                    **KOEHLER & ISAACS LLP**
                    Attorneys for Plaintiffs
                    61 Broadway, 25th Floor
                    New York, NY 10006
                    917 551 1353


            By:  _____/s_____
                    **MATHEW PAULOSE JR., ESQ. (MP6002)**